## Grant County Bd. of Control, et al v. Allphin

(Decided February 18, 1913.)

### Appeal from Fayette Circuit Court.

1.  Specific Performance—Nature and Grounds of Relief—Inadequacy of Remedy at Law—Injunction—Contracts.—A court of equity has jurisdiction to enjoin a breach, and thus indirectly compel specific performance, of a contract, notwithstanding a covenant therein to pay liquidated damages upon its breach, if, from the contract and the circumstances surrounding its execution, it appears that the performance of the contract was intended and not to give to the covenantor the option either to perform or to pay the stipulated damages, and also that the remedy at law is inadequate.

2.  Contracts—Construction—Pooling Contract.—The purpose of a clause in a pooling contract, providing for liquidated damages upon its breach, is to secure the performance of the contract and not to give the option to pay the damages and violate the contract.

3.  Contracts—Parties Proposal and Acceptance—Evidence of Agreement—Principal and Agent—Ratification.—A party, claiming to act as agent for the owner of a crop of tobacco, signed the owner's name to a card giving the number of acres of tobacco grown, delivered it to the agent of a pooling society with the request that he pin it to a pooling contract, stating at the time that the owner wanted to pool his tobacco. These acts were ratified by the owner by notice to the society that he wanted to pool, and by circulating the report throughout his neighborhood that his tobacco had been pooled. Evidence shows that the owner had pooled his tobacco.

4.  Trial—Rejection of Evidence—Competency.—In action for specific performance of contract and plea of *non est factum* evidence that the owner of tobacco had circulated the report that it had been pooled in order to prevent its destruction by supposed night riders was properly rejected.

ALLEN & DUNCAN, for appellants.

J. A. EDGE, for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

The Grant county Board of Control and the Burley Tobacco Society filed suit in the Fayette circuit court against A. S. Allphin, in which they sought to enjoin him

from selling, or otherwise disposing of, a crop of tobacco raised by him in 1909 and which, it is alleged in the petition, he had pooled. The petition set out the fact of the organization of the Burley Tobacco Society, and of the Grant county Board of Control, a branch thereof; that the business of the society was the pooling of tobacco grown in the burley district in order to enable the growers thereof, by commingling, sorting, grading, etc., to procure a price therefor, commensurate with its real value; that the defendant had signed one of the contracts pledging or pooling his said tobacco crop; that he was about to dispose of it, in violation of his agreement; that he had shipped it to Lexington for sale; and that, unless restrained from so doing, he would sell it, to the great and irreparable injury of the plaintiffs. A restraining order was issued, and the tobacco was taken charge of by a receiver, appointed by the court for that purpose. The defendant demurred to the petition, and the demurrer being overruled, he answered, denying that he had pooled his tobacco. Upon this issue, proof was taken. The chancellor, upon submission of the case, found for the defendant and dismissed the petition. The plaintiffs appeal.

Counsel for appellee, in brief, insists that the judgment of the lower court should be affirmed upon two grounds. First, it is urged that appellants had an adequate remedy at law, and they were not, therefore, entitled to injunctive relief; and second, that the evidence supports the finding of the chancellor upon the question of fact as to whether or not the tobacco was pooled.

The alleged pooling agreement contains the following provision: "Upon our failure to fully comply with the terms and conditions of this contract, we hereby agree to pay to said society as liquidated damages, twenty per cent., (20%) of the value of said tobacco, for the benefit of the members of said society." Counsel for appellee contends that a court of equity is without jurisdiction to enjoin a breach of the contract, and thus indirectly compel its specific performance, because, by this provision stipulating the damages payable or recoverable for the breach, appellants are remitted to their action for damages. It is not, and cannot, be claimed that, without such stipulation, the damages resulting from a breach are susceptible of ascertainment with such certainty, as would not authorize a court of equity

to grant the relief asked. So, the question is, may a court of equity enjoin a breach of the contract, notwithstanding the provision for specific damages therefor? The question is a new one in this jurisdiction, and decisions of courts of last resort in this country upon it are not in harmony. The rule sustained by the soundest reasoning and the greater weight of authority, is, if it is apparent, from the whole instrument and the attendant circumstances surrounding its execution, that the parties intended the performance of the contract, and not the payment of the damages stipulated as the price of nonperformance, a breach of the contract will be enjoined. If the intention was to give to the party the option to perform the contract or to pay the stipulated damages, then equity will not interfere. In 22 Cyc., 870, the author thus states the rule:

"If liquidated damages are provided for in case of a breach, and it appears that the intention was to give the party the alternative to perform or pay, the breach will not be enjoined. Where the contract is an absolute one, and cannot be construed as meaning that defendant shall have the right to do the prohibited acts on paying the sum named, an injunction will be granted to restrain him, whether or not the sum to be paid be regarded as liquidated damages."

The Supreme court of Massachusetts had under consideration this question in the case of Ropes v. Upton, 125 Mass., 258. There, Ropes and Upton were partners, engaged in manufacturing and selling stoves and tinware in Denvers, Mass. Upton sold his interest to Ropes and in the contract of sale, there was this provision: "I hereby agree not to manufacture or sell (stoves or tinware) or become engaged in said business, either for myself or others, hereafter in the town of Denvers, under the forfeiture of $1,000, to be paid to said Ropes in cash of breach of these conditions." Upton having violated his agreement by engaging in said business, Ropes sought to enjoin him from so doing. Defense was made upon the ground of want of equity, in that plaintiff had a plain, adequate and complete remedy at law, and must bring his action for the damages stipulated in the contract. The court there reviewed many English authorities, from which it deduced and adopted the following rule:

"It is often stated that a court of equity will not

interfere to prevent a party from doing an act which he has agreed not to do, when liquidated damages are provided in case he does the act. But this must be taken with some qualifications; for it must appear from the whole contract, that the stipulated sum was to be paid in lieu of the strict performance of the agreement, and was an alternative which the party making the covenant had the right or option to adopt.''

In applying the rule to the facts of that case, that court said that a court of equity fastens on the real contract, and compels the execution of the very thing covenanted to be done; that there was nothing to show a right or option in the defendant to manufacture, upon the payment of the money, or that the agreement would be satisfied by the payment of the sum stated; that it is an absolute engagement not to do certain acts, and thereby interfere with plaintiff's business; that this is a distinct covenant, independent of the stipulation to pay a sum of money in case of a violation of the agreement; and that the court would interfere by injunction.

In Wills v. Forester, 124 S. W., 1090, the Missouri Court of Appeals had before it this identical question. There Wills sought to enjoin Forester from operating and conducting a retail lumber business in St. James, Mo., in violation of an agreement not to do so. The agreement contained the following provision: ''In case of any violation of the agreement by the parties of the first part they hereby acknowledge themselves indebted to the said parties of the second part, either collectively or singly, in the sum of one thousand dollars.'' The court, after reviewing many authorities, said:

''Thus, reason and authority show that contracts with a stipulation like that in the present case which provide for a remedy at law do not oust equity of its jurisdiction. The remedy at law for damages and the remedy in equity for specific performance are not exclusive of each other, but are cumulative. The determining criteria as to the ouster of equity jurisdiction comes, in its last analysis, to the intention of the parties to be gathered from the agreement itself in each particular case. * * * The fact that the damages are liquidated does not of itself change the rule. It is a question of the real intention of the parties to be deduced from the whole instrument and the surrounding circumstances, and if it appear from these that the performance of the

contract was intended, and not merely the payment of damages in case of its breach, the agreement will then be enforced by specific performance.''

In the case at bar, the very life and success of the undertaking in which appellants were engaged depended upon whether or not a considerable number of growers would pool their tobacco for sale through appellants. The clause providing for liquidated damages was not inserted in the pooling contract for the purpose of giving to appellee the right to pay the damages stipulated and dispose of his tobacco otherwise than as provided in his agreement. It was inserted rather as security for the performance of the contract. The object of the society was, as stated, the commingling, grading, handling and sale of tobacco so as to make it bring its fair cash value, and it is apparent that, if those entering the pool were permitted at will to sell their tobacco in violation of their contracts, the very aim of the society would be defeated, and the sum agreed upon in the contract as liquidated damages would be no adequate compensation for the breach of the contract. Indeed, its breach, under such circumstances, could not well be measured in damages. Such a breach, if indulged in by any considerable number of the poolers or signers of the agreement, would not only work an irreparable injury to the society but result in its utter ruin. Appellee covenanted not to sell his tobacco, except through the society, and this covenant is wholly independent of his agreement to pay, upon breach of the contract, the damages stipulated therein. The facts of this case call, with peculiar aptness and force, for the exercise of injunctive relief. The court correctly held that the petition stated a cause of action.

Upon the question of fact, the evidence for appellants shows that A. S. Allphin lived with his father, H. Z. Allphin, in Grant county in the Cross Roads precinct. He cultivated some tobacco on his own land and some on rented land. G. S. Brumback was the pool solicitor for the society in that precinct. J. C. Hedger was the pooler for the society in the Downingsville precinct, which adjoins the Cross Roads precinct. Part of this tobacco was grown in one precinct, and part in the other. Hedger solicited appellee on several occasions to pool his tobacco, and finally appellee announced to him that he was ready to do so and asked him if he

had his pooling book in his pocket. On that occasion, he did not have his book, and they parted with the understanding that the tobacco was to be pooled. Shortly thereafter Hedger met W. L. Allphin, a brother of appellee, and after a conversation about this tobacco, Hedger asked W. L. Allphin where appellee was, and W. L. answered that his brother was then in Scott county conducting a religious meeting. Thereupon Hedger stated that he wanted to get the matter closed up in his precinct and requested W. L. to pool his brother's crops for him, and W. L. did sign a pooling contract as agent for his brother, and by this contract the tobacco in suit was pooled. It is the contention of appellants that, while W. L. Allphin may have had no authority to represent appellee in the pooling of this tobacco, he afterwards learned that it had been pooled by his brother for him, and that he ratified the act of his brother in so doing. Appellants likewise claim that this tobacco was pooled with G. S. Brumback, solicitor for the Cross Roads precinct. Brumback testifies that, early in October, H. Z. Allphin, the father of appellee, told him that his son, A. S., wanted to pool his tobacco, and, as he was out of the county, that he, H. Z., would pool it for him, and that he thereupon signed a card setting forth the number of acres of tobacco owned by his son, signed his son's name to it, and requested Brumback to pin the piece of paper to a contract; and that he regarded the tobacco as having been pooled for appellee by his father. This witness testifies that later he received a post card from appellee in which he stated that every one had signed in his precinct but himself, and he wanted to make it one hundred per cent. Thus, according to the evidence for appellants, this tobacco was pooled by W. L. Allphin and H. Z. Allphin for appellee, and in the post card which he wrote to Brumback, he clearly and unequivocally ratified the acts of his father and brother, if the statement on the card did not of itself amount to a pooling. It is in testimony for appellant, and admitted to be true by appellee and his father, that it was generally understood around in the neighborhood that he had pooled his tobacco; and that they encouraged this understanding and gave the report circulation, for the reason, as they stated, they feared if they did not the tobacco would be destroyed by night riders. It is not denied that W. L. Allphin pooled the

tobacco for his brother, and Brumback testifies emphatically that H. Z. Allphin pooled it for him. While H. Z. Allphin testifies that he did not do so, but merely wrote his son's name on the card giving the amount of tobacco which had been raised by him to serve as a reminder to the pooler that he might come on the following Wednesday to see his son, when he might pool, the effect of his testimony is very much weakened by his subsequent statement, in which he says that he gave it out through the neighborhood that his son's tobacco had been pooled. That appellee knew that his father and his brother had signed a pooling contract for him, there cannot be the least doubt, for, not only did he write the post card to Brumback, telling him that he wanted to pool his tobacco to make it one hundred per cent., but he told several people throughout the neighborhood that he had pooled his tobacco. Even after he had attempted to dispose of it and Brumback had learned of this fact and went to see him about it, he admitted that it was pooled and denied any intention of attempting to dispose of it. Not only does the evidence not justify the finding of the chancellor to the effect that this tobacco was not pooled, but the overwhelming weight of the evidence shows that it was pooled. Upon the trial, appellee, and his father as well, seeing that they were overwhelmed by the evidence to the effect that the tobacco was pooled, sought to avoid the enforcement of the contract by statements to the effect that they stated that it had been pooled in order to prevent the destruction of the tobacco by supposed night riders. This was objected to upon the ground, no doubt, that it was not in support of any plea. The point was well taken. Had appellee admitted the execution of the contract and pleaded that he was compelled to do so under the fear of his having his property destroyed, this evidence should have been admitted; but, under the plea of *non est factum*, the court should have disregarded this evidence. With this excluded, we have the statement of the pooling officers that this tobacco was pooled by W. L. and H. Z. Allphin for appellee; the statement by H. Z. and W. L. Allphin, and by appellee, made frequently throughout the neighborhood, that the tobacco had been pooled, thus clearly showing not only that the testimony of the poolers to the effect that W. L. and H. Z. did sign the pooling contract for appellee, but also

that, after it had been signed by them for him, appellee ratified their act in so doing.   Upon this showing the judgment should have been for the plaintiff, and the trial court erred in not so holding.

Judgment reversed and cause remanded, with instructions to enter judgment in conformity with this opinion.